**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

QUEST SHIPPING LIMITED,

                  Plaintiff,

– against –

THE AMERICAN CLUB, AMERICAN STEAMSHIP OWNERS MUTUAL PROTECTION AND INDEMNITY ASSOCIATION INC., and SHIPOWNERS CLAIMS BUREAU INC.,

                  Defendants.

**OPINION AND ORDER**

18 Civ. 10667 (ER)

Ramos, D.J.:

        Quest Shipping Limited ("Quest") brings this action against the American Club, the American Steamship Owners Mutual Protection and Indemnity Association Inc., and the Shipowners Claims Bureau Inc. (the "Claims Bureau") (collectively, "Defendants"), for declaratory judgment pursuant to 28 U.S.C. § 2201 and for breach of contract. Doc. 1. Both causes of action arise from the Claims Bureau's termination of Quest's maritime insurance coverage with the American Club while claims for two of its ships were still pending. *Id.* ¶¶ 12–40. Before the Court are the parties' cross-motions for summary judgment. For the reasons stated below, Defendants' motion is GRANTED, and Quest's motion is DENIED.

I.   BACKGROUND

   A. Factual Background[1]

   *1. The American Club Model*

The American Club is a non-profit mutual protection and indemnity insurance association providing marine insurance to its members. Doc. 35 ¶ 1. Defendants explain that the American Club's members are vessel owners and charters who act as both insurers and insured, agreeing to mutually indemnify each other against third-party liabilities arising from vessel ownership or activity. *Id.* ¶ 4–6.[2] Quest, a Nigerian company, was a member of the American Club from at least February 2015 to December 2017, though the exact beginning date is in dispute. *Id.* ¶¶ 20–21; Doc. 40 ¶ 1, 6. During that time, Quest insured two vessels: the Alexander J and the Danny Rose. Doc. 35 ¶¶ 20–21.

To participate in the American Club, members pay premiums and assessments proportionate to their share of claims, as provided by the marine insurance contract. *Id.* ¶ 7. The marine insurance contract is comprised of a Certificate of Entry—issued to members as proof of insurance for an entered vessel for each coverage year—and the American Club's by-laws and rules (the "Rules"). *Id.* ¶¶ 16–18. Pursuant to this contract, all American Club business is conducted by the Board of Directors (the "Board"), which Defendants maintain is composed mostly

---

[1] The following facts are drawn from Defendants' Rule 56.1 Statement of Undisputed Material Facts (Doc. 23), Plaintiff's Rule 56.1 Counter-Statement (Doc. 35), Plaintiff's Statement of Undisputed Material Facts (Doc. 36), Defendants' Rule 56.1 Counter-Statement (Doc. 40), and the parties' supporting submissions. Any citation to the parties' 56.1 Statements incorporates by reference the documents cited therein. All facts are expressly undisputed, unless otherwise indicated.

[2] Quest neither admits nor denies several of Defendants' factual allegations because "it lacks sufficient knowledge to form a belief." *See generally* Doc. 35. Defendants argue in their Opposition/Reply papers that any factual allegations not specifically disputed should be deemed admitted. Doc. 38 at 2 n.2. Quest does not respond to this argument in its Reply, and therefore concedes it. *See In re UBS AG Sec. Litig.*, No. 07 Civ. 11225 (RJS), 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (arguments not addressed in opposition are conceded). In any event, to the extent some of the underlying facts regarding the American Club's structure are disputed, they are irrelevant to the Court's decision on summary judgment.

2

of member representatives. *Id.* ¶¶ 8–9. The American Club's day-to-day operations are overseen by a Board-appointed manager, in this case the Claims Bureau. *Id.* ¶¶ 10–12. Defendants allege that, as part of its duties, the Claims Bureau collects premiums, determines whether coverage is available for claims, handles claims that have been submitted, and cancels coverage for non-payment of premiums. *Id.* ¶ 13. Decisions regarding coverage are reviewed and adjudicated by the Board. *Id.* ¶ 14.

### 2. *The Marine Insurance Contract*

The Rules vest the Claims Bureau with the authority to terminate a member's coverage if the member "fail[s] to pay, either in whole or in part, any amount due." *Id.* ¶ 26. In this event, the Claims Bureau is to first provide the member with a notice of cancellation ("NOC") at least five days before terminating coverage. *Id.* If payment is not made by the date specified in the NOC, "the insurance of the Member . . . in respect of any and all vessels insured for account or on behalf of the Member shall be terminated immediately without further notice or other formality." *Id.* After termination,

> The Association shall with effect from the date of termination cease to be liable for any claims of whatsoever nature and howsoever arising under these Rules . . . irrespective of whether . . . such claims have arisen by reason of any event which has occurred at any time prior to the date of termination, including during previous years; . . . or . . . the Managers at the date of or prior to the date of termination knew that such claims might or would arises; and as from the date of termination any liability of the Association for such claims shall cease retroactively and the Association shall be under no liability to the Member for any such claims or on any account whatsoever.

*Id.* The Claims Bureau may always, in its "absolute discretion . . . admit either in whole or in part any claim in respect of a vessel insured by the Member for which the Association is under no liability," though it does not have an obligation to do so. *Id.*

Should a member disagree with the Claims Bureau's decision, the Rules prescribe a process for appeal. *Id.* ¶ 24. In relevant part, Rule 1.4.48 provides that:

3

> a. If any difference or dispute shall arise between a Member and the Association and/or its agents (which shall include, without limitation, the Association's Manager . . . ) concerning the construction of the Member's contract with the Association, or the insurance afforded by the Association under the contract, or any amount allegedly due from the Association to the Member, or any other difference or dispute, and the Member is dissatisfied with the Manager's final decision, the Member may submit a Notice of Appeal to the Association's Board of Directors asking it to adjudicate the difference or dispute. . . .
>
> b. The procedures for adjudication by the Directors, which are incorporated into this Rule, are stated in Appendix A to these Class I Rules.
>
> c. No Member shall be entitled to maintain any action, suit or other legal proceedings against the Association and/or its agents upon any such difference or dispute unless and until the same has been appealed to the Association's Board of Directors and it shall have adjudicated the dispute and given its decision thereon. . . .
>
> d. The decision of the Association's Board of Directors is intended to be final and binding. However, should the Member wish to appeal that decision, such appeal shall be brought only by suit against the Association in the United States District Court for the Southern District of New York and must be commenced no later than sixty days after the Board's decision has been provided to the Member.

*Id.* ¶ 24. According to the Rules, "[t]he [parties'] written submissions including any exhibits shall constitute the record upon which the Directors' adjudicatory decision shall be based." *Id.* ¶ 25. "The Member, as the party seeking modification of the Manager's decision, has the burden of proving by a preponderance of credible evidence that it is entitled to such modification." *Id.* "As the Board decision is final, it may be modified by a court only upon a finding that the decision was arbitrary and capricious, that is, without reason, an issue on which the Member shall have the burden of proof." *Id.*

The Rules further contain an anti-waiver and anti-estoppel provision and specify that New York law shall apply. *Id.* ¶¶ 27–28.

### 3. *Termination of Quest's Coverage*

On at least seven occasions before December 2017, Quest's premium installments to the American Club were not paid when due. *Id.* ¶¶ 29–36. Defendants maintain that on December 12, 2017, the Claims Bureau contacted Quest's insurance broker and advised it that failure to timely pay the premium installment due December 20, 2017 would result in a five-day NOC. *Id.* ¶ 38. Payment was not received on that date, and a five-day NOC was issued on December 22, 2017. *Id.* ¶¶ 39–40. Quest's coverage was terminated on December 27, 2017. *Id.* ¶ 42. Quest never paid the December 20, 2017 premium installment. *Id.* ¶ 41.

Quest alleges that prompt payment of the premium was impossible, as all days between December 22, 2017 and December 28, 2017—except for December 27, 2017—were holidays in Nigeria.[3] Doc. 40 ¶¶ 15, 17. It maintains that when it received the NOC late in the day on December 22, it promptly arranged to have funds sent to its London broker, who received the funds on December 28, 2017,[4] by which time its coverage had already been terminated. *Id.* ¶ 16.

At the time of termination, there were claims pending for both the Alexander J and the Danny Rose. The Danny Rose was involved in a collision in 2015. *Id.* ¶ 9. And in January 2016, the Alexander J collided with a barge. *Id.* ¶ 10. For various reasons that the parties dispute and that are irrelevant to the instant litigation, neither claim was resolved as of December 2017. *Id.* ¶¶ 9–14. After Quest's termination, the Claims Bureau also terminated coverage for these claims as well. Doc. 35 ¶ 44. Quest maintains that Defendants had improperly delayed

---

[3] Because the notice was received past Noon on December 22, any transfer of funds could not occur until the next working day; December 23–24 was a weekend; December 25 was Christmas Day; and December 26 was Boxing Day, which is a bank holiday in Nigeria. Doc. 40 ¶¶ 15, 17.

[4] Defendants maintain that Quest only transferred part of the funds due. *Id.* ¶ 16.

5

settling these claims and that its coverage was terminated because Defendants were "looking for a way to get out of the insurance coverage." *Id.* ¶ 44.

### 4. Quest's Appeal

Pursuant to Rule 1.4.48, Quest appealed the Claims Bureau's determination to the Board on January 24, 2018. Doc. 40 ¶ 19. Both parties had an opportunity to submit their respective positions. *Id.* ¶¶ 20–22. On September 20, 2018, the Board unanimously denied Quest's appeal. *Id.* ¶ 23. In its decision, the Board found that Quest's coverage was properly canceled and that the Claims Bureau did not improperly delay settling the pending claims. Doc. 35 ¶ 50.

### B. Procedural History

Quest began this action on November 15, 2018. Doc. 1. It brings two causes of action. First, it seeks a declaration "that Defendants are obligated, pursuant to the terms of the Policies, and under the laws of [the] State of New York to provide insurance benefits for Plaintiff's losses and liabilities as a result of the collisions of Danny Rose and Alexander [J]." *Id.* ¶ 43. Next, it seeks monetary damages for breach of the implied covenant of good faith and fair dealing, allegedly caused by Defendants' failure to pay insurance benefits for the two collisions. *Id.* ¶¶ 44–51. Defendants answered the Complaint on January 8, 2019. Doc. 13. On March 4, 2019, Defendants filed a motion for summary judgment on all counts. Doc. 22. Quest cross-moved for summary judgment on April 18, 2019. Doc. 31.

## II. LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free Sch. Dist.*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d

6

133, 137 (2d Cir. 2009)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* (internal quotation marks and citation omitted). "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). If this occurs, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Id.* (internal citation omitted).

In deciding a motion for summary judgment, the Court construes the facts in the light most favorable to the nonmovant and resolves all ambiguities and draws all reasonable inferences against the movant. *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011). The nonmovant, however, may not rely on unsupported assertions or conjecture in opposing summary judgment. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). Rather, the nonmovant "must set forth significant, probative evidence on which a reasonable factfinder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986)). "To avoid summary judgment, all that is required of the non-moving party is a showing of sufficient evidence supporting the claimed factual dispute as to require a judge or jury's resolution of the parties' differing versions of the truth." *Id.*

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cty.*, 661 F.3d 128, 139 (2d Cir. 2011)); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach

7

party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." (citation omitted)). The Court is not required to resolve the case on summary judgment merely because all parties move for summary judgment. *Morales*, 249 F.3d at 121.

## III. DISCUSSION

In their motion for summary judgment, Defendants maintain that Quest's claims amount to a review of the Board's decision, which was the product of an agreed-upon alternative dispute resolution ("ADR") procedure. As such, the Court should apply an arbitrary and capricious standard of review, as provided for by the Rules. Under this standard of review, the Court should defer to the Board's finding that Quest's coverage, including for claims pending at the time, was properly terminated and that Defendants were no longer liable for those claims after termination. *See* Doc. 24. Quest disagrees. In its cross-motion for summary judgment, it argues that the applicable standard is abuse of discretion. Judicial deference would be inappropriate, it claims, because a conflict of interests exists when the plan administrator also pays out the benefit claims. Moreover, the ADR procedure was invalid because it lacked fundamental fairness and was contrary to public policy. Even if the arbitrary and capricious standard applies, the Court should still vacate the Board's decision, even more so because, under New York's "mailbox rule," the payment was effective when it was tendered on December 22, 2017. *See* Doc. 37.

The Court considers each of these arguments in turn.

### A. Standard of Review

As a threshold issue, the parties purport to disagree over the applicable standard of review. To be clear, Quest is not asking for *de novo* review of the Board's findings; rather, it is asking the Court to apply "the abuse of discretion and substantial evidence standard" because, it argues, a conflict of interest exists when the plan administrator also pays out the claims. Doc. 37

8

at 7–8. The Court notes that both the "abuse of discretion" standard and the "arbitrary and capricious" standard are highly deferential and are sometimes used interchangeably. *See Hines v. First Unum Life Ins. Co.*, 14 Civ. 2961 (ER), 2016 WL 1246483, at *10 (S.D.N.Y. Mar. 23, 2016). "A decision is arbitrary and capricious only if it is found to be 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Miles v. Principal Life Ins. Co.*, 720 F.3d 472, 486 (2d Cir. 2013) (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)). "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the administrator and requires more than a scintilla but less than a preponderance." *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010) (internal quotation marks and citation omitted). Similarly, a decision constitutes an abuse of discretion when it "rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding," or "though not necessarily the product of a legal error or a clearly erroneous factual finding . . . cannot be located within the range of permissible decisions." *Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 168–69 (2d Cir. 2001).

To the extent Quest is arguing for a less deferential standard of review, the level of judicial deference afforded to the Board's decision turns on whether it was the product of a previously agreed-upon ADR procedure. If so, then the Court will apply the "arbitrary and capricious" standard of review provided for by the Rules. *See TransAtlantic Lines LLC v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*, 253 F. Supp. 3d 725, 735 (S.D.N.Y. 2017) (applying arbitrary and capricious standard of review). In at least three other similar disputes, courts in this District have found that the Board's decisions are the product of an ADR procedure. *See Venetico Marine S.A. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*, 15 Civ. 8351 (DAB), 2018

9

U.S. Dist. LEXIS 156378 (S.D.N.Y. Sept. 10, 2018); *TransAtlantic Lines LLC*, 253 F. Supp. 3d 725; *Progress Bulk Carriers v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n, Inc.*, 939 F. Supp. 2d 422, 427 (S.D.N.Y. 2013), *aff'd*, 2 F. Supp. 3d 499 (S.D.N.Y. 2014). This Court agrees.

The Rules provide that "[i]f any difference or dispute shall arise between a Member and the Association . . . the Member may submit a Notice of Appeal to the Association's Board of Directors asking it to adjudicate the difference or dispute." Doc. 25, Ex. 3 at 44. This is meant to be the exclusive avenue of dispute resolution. *Id.* ("No member shall be entitled to maintain any action, suit or other legal proceedings against the Association and/or its agents upon any such difference or dispute unless and until the same has been appealed to the Association's Board of Directors and it shall have adjudicated the dispute and given its decision thereon."). Moreover, "[t]he decision of the Association's Board of Directors is intended to be final and binding." *Id*. Any appeal must be brought in the District Court for the Southern District of New York and must be commenced within sixty days of the Board's decision. *Id.* The Rules themselves dictate an "arbitrary and capricious" standard of review. *Id.* at 107. It appears abundantly clear from this language that the parties "intended to grant the Board the authority to make final and binding decisions concerning coverage disputes." *Progress Bulk Carriers*, 939 F. Supp. 2d at 428 (analyzing similar contract terms).

Quest does not deny that it agreed to and was familiar with the Rules and that it followed their prescribed internal procedures. Doc. 37 at 3. Instead, it argues that the arbitrary and capricious standard should not apply because of the conflict of interest that exists when the insurance administrator is the same as the entity that pays out the claim. It points to two cases in support of this proposition: *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105 (2008), and *McCauley v. First Unum Life Insurance Company*, 551 F.3d 126 (2d Cir. 2008). These cases are

10

inapposite for at least two reasons. First, these cases were decided in the context of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, and their reasoning is inapplicable to the case at hand. In *Glenn*, for example, the Court found that in the context of trust law, "the fact that a settlor (the person establishing the trust) approves a trustee's conflict does not change the legal need for a judge later to take account of that conflict in reviewing the trustee's discretionary decisionmaking." 544 U.S. at 113. Such is not the case in contract law, where "the parties' intentions control." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985)). Second, even if these cases were relevant, they do not necessarily mandate a less deferential standard of review. Under these cases, a court must take a conflict of interest into account and weigh it as a factor in determining whether there was an abuse of discretion; but this "does not make *de novo* review appropriate." *McCauley*, 551 F.3d at 133. In other words, the appropriate standard of review under these cases is still abuse of discretion—or arbitrary and capricious.[5]

For the foregoing reasons, the Court will apply an arbitrary and capricious standard of review, as provided for by the Rules.

**B. Validity of the ADR Process**

Quest next attacks the validity of the Rules' ADR process on two grounds. First, it argues that the process lacked fundamental fairness. Specifically, Quest argues that the Board

---

[5] Furthermore, any alleged conflict of interest present here would not weigh in favor of finding an abuse of discretion because it was one the parties explicitly agreed to by contract. "An ADR panel must 'grant the parties a fundamentally fair hearing,' but, by the same token, it 'need not follow all the niceties observed by the federal courts.'" *Transatlantic Lines* LLC, 253 F. Supp. 3d at 730 (quoting *Bell Aerospace Co. Div. of Textron, Inc. v. Local 516, Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. (UAW)*, 500 F.2d 921, 923 (2d Cir. 1974)).

11

was biased because its members had a financial interest in denying Quest's claim. Doc. 37 at 8–9. This very argument was considered—and rejected—by the court in *Transatlantic Lines LLC*, 253 F. Supp. 3d 725. There, the court found that allegations of bias "ignore[] the fact that the supposed bias was one inherent in the ADR arrangement to which [Plaintiff] voluntarily agreed when it joined the Association." *Id.* at 730. So too here did Quest indisputably agree to the Rules. *See, e.g.*, Doc. 35 ¶¶ 14, 16–19, 22, 24–28. The unfairness it complains of, then, "is totally unlike a situation where an individual arbitrator has a concealed bias," and "is, instead, an attack on the very ADR procedure to which [it] knowingly and voluntarily agreed." *Id.* at 730–31 (internal citations omitted).

Second, Quest states in a footnote that "it is against public policy to have [an] insurance policy that required the insured to maintain coverage after the covered incident." Doc. 37 at 16 n.1. However, it presents no arguments as to why this policy "violates a well-defined constitutional, statutory or common law of New York State." *TransAtlantic Lines LLC*, 253 F. Supp. 3d at 733 (internal quotation marks and citations omitted). As such, this argument is without merit.

**C. Review of the Board's Decision**

Quest further urges that even if an arbitrary and capricious standard of review does apply, the decision should nevertheless be vacated because the Board failed to consider all relevant factors, specifically whether Defendants acted in bad faith—and therefore breached the duty of good faith and fair dealing—when they cancelled the insurance policy over the holidays, allegedly in order to avoid paying Quest's pending claims on the Alexander J. and the Danny Rose. Doc. 37 at 9–15.

"In reviewing ADR decisions, courts are limited to considering the record before the decisionmaker." *Progress Bulk Carriers*, 939 F. Supp. 2d at 429 (quoting *Grey v. F.D.I.C.*, No.

88 Civ. 7452 (THK), 2002 WL 959564, at *10 (S.D.N.Y. May 8, 2002) ("It is well settled that a court lacks the power to consider newly submitted evidence when reviewing an arbitration proceeding." (internal quotation marks and citation omitted))). To reach its determination, the Board considered "letter briefs to the Directors with exhibits submitted by Quest and the Managers." [6] Doc. 25, Ex. 7 at 1.

Upon review, Quest's arguments on appeal amount to little more than a rehash of its arguments before the Board. Contrary to Quest's assertions, the Board did consider whether the NOC "was without prior warning, was not reasonable or fair, was 'impossible' to meet and [whether] the Managers issued the NOC only to avoid paying Quest's claims regarding collisions involving its two entered vessels, the MT Alexander J. and the MT Danny Rose." *Id.* at 1–2. In rejecting these arguments, the Board found that "the prompt, proper payment of all mutual premiums and other amounts due from each Association member in each separate insurance year is essential to the operation of this Association as a non-profit, mutual marine insurance association." *Id.* at 3. It also found that "[w]hile a five-day NOC may seem short . . . weeks before issuing the NOCs, the Managers gave Quest warnings that if premiums and other sums due were not paid within specified times then, as a last resort, NOCs would be issued." *Id.* at 5. Because Quest had been warned on December 12, 2017 that an NOC would issue if payment was not promptly received when it was due on December 20, 2017, the Board found that "Quest

---

[6] In its Reply Memorandum, Quest for the first time "notes that the parties never had a Rule 26 disclosure and thus, [it] will not rely on Defendant[s'] assertions that all of the exhibits Defendant[s] attach[] where [*sic*] part of the record while [its] exhibits were not." Doc. 44 at 2. It concludes that "[i]n any event, discovery will be necessary for Defendant to prevail on this argument." *Id.* The Court disagrees. In its Rule 56.1 Counter-Statement, Quest admits that the documents attached as Exhibit F to the Declaration of Donald R. Moore ("Exhibit F") were presented to the Board. Doc. 35 ¶¶ 47–49. Moreover, the only exhibit Quest attaches to its declarations—a copy of the telex allegedly showing that payment was posted from Quest's account on December 22, 2019, Doc. 32, Ex. 1—is included in Exhibit F. *See* Doc. 25, Ex. 6 at 15. Quest has therefore identified no additional documents that were before the Board.

actually received a 15-day NOC (December 12th to 27th)." *Id.* at 8. The Board further found that "[a]s Quest had adequate time on December 22nd to arrange a bank transfer to its London broker, Quest also had adequate time that day to make a bank transfer to the Association, which funds would have arrived in the Association's bank account on or before December 27th." *Id.*

As to allegations of bad faith, Quest offered "no details or witnesses or exhibits to prove" that the Claims Bureau cancelled its policies to avoid paying the outstanding insurance claims. *Id.* at 9. In fact, the Board found that "Quest, itself delayed possible settlement of the Alexander J collision claim." *Id.* at 11 (citing to e-mail communications with the Manager's London office on November 13–23, 2017). In conclusion, the Board clarified that it "considered each of Quest's appeal arguments" and found that these "[were] not supported by evidence, and . . . [were] conclusory . . . [and were] not credible." *Id.* at 16.

The Board's decision is thorough, well-reasoned, and supported by the record. The Court sees no reason to disturb it.

### D. The Mailbox Rule

Finally, Quest argues that because it wired funds to its London broker on December 22, 2017, the mailbox rule dictates that payment was effectively tendered to the American Club on that date. Doc. 37 at 15–16. The "mailbox rule" is a "rebuttable, common-law presumption that a piece of mail, properly addressed and mailed in accordance with regular office procedures, has been received by the addressee." *Cooke v. United States*, 918 F.3d 77, 81 (2d Cir. 2019) (citing *Akey v. Clinton Cty.*, 375 F.3d 231, 235 (2d Cir. 2004)).

The question of "whether the 'mailbox rule' applies to contracts created through telex [is] apparently still unresolved.'" *Centre-Point Merch. Bank Ltd. v. Am. Express Bank Ltd.*, No. 95 Civ. 5000 (LMM), 2000 WL 1772874, at *3 n.7 (quoting *Metro. Air Serv., Inc. v. Penberthy Aircraft Leasing Co.*, 648 F. Supp. 1153, 1156 (S.D.N.Y. 1988)). However, Quest's argument is

unavailing for an independent reason.  Quest does not dispute that the payment was never actually tendered to Defendants.  Doc. 35 ¶ 41.  Yet, Quest did not "take appropriate steps to cure the problem."  *Zamora-Leon v. United of Omaha Life Ins. Co.*, 15 Civ. 9206 (JMF), 2017 WL 4155403, at *3 (S.D.N.Y. Sept. 18, 2017).  "Because [it] failed to do so, [it] cannot invoke the mailbox rule and [Defendants were] entitled to terminate [its] policies for non-payment."  *Id.*

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED, and Quest's motion for summary judgment is DENIED.  The Clerk of Court is respectfully directed to termination the motion, Doc. 22, and close the case.

SO ORDERED.

Dated: March 18, 2020
New York, New York

Edgardo Ramos, U.S.D.J.